## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

JENNIFER FURAUS,

        Plaintiff,

    vs.                                       No. CIV 02-444 LH/LFG

CITADEL COMMUNICATIONS
CORPORATION,

        Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Citadel Communications Corporation's Motion for Summary Judgment (Docket No. 26), filed December 13, 2002. The Court heard oral arguments on May 20, 2003. Having considered the briefs submitted by the parties, the arguments of counsel, and otherwise being fully advised, the Court finds that Defendant's motion is **well-taken** and should be **granted.**

## I.      BACKGROUND

Plaintiff brings this action for gender discrimination on the basis of disparate treatment, disparate compensation, constructive discharge, and retaliatory discharge under Title VII and the New Mexico Human Rights Act (NMHRA). There are few, if any, disputed facts.

Plaintiff was employed for almost three years, from July 1998 to July 2001, as an announcer for Defendant's radio station, KGMA ("Magic 99.5"), in Albuquerque, New Mexico. During most

of that time, the station employed three announcers and played "soft rock" music.  Phil Moore did

the morning show live Monday through Friday, 5:30 to 10:00 a.m.  Plaintiff, Jennifer Furaus (a/k/a

Jenna James, her on-air personality) did the mid-day show live Monday through Friday, 10:00 a.m.

to 3:00 p.m.  Roger Gettler (a/k/a Roger Scott, his on-air personality) did the late afternoon show,

mostly live, Monday through Friday, 3:00 to 7:00 p.m., with the last hour pre-recorded.

Roger Gettler served the station not only as a radio announcer, but also as the Program

Director and Plaintiff's and Moore's direct supervisor.  Gettler made the decisions about the music

programming, the announcers' schedules (including his own), and other managerial tasks, such as

approving sick leave and vacation leave.

In the fall of 1999, the station obtained software that allowed announcers to take a pre-

assembled radio show, with music, announcements, and advertising, and add the voice transitions.

This technology enabled the three announcers to pre-record entire shows during the week, and the

station could air the shows on the weekends.  Testimony indicates that the entire process of creating

a five- or six-hour show, including recording and inserting the voice transitions and announcements,

required twenty to forty-five minutes of work time.  For the weekends, Phil Moore pre-recorded one

show to be aired on Saturday mornings, Plaintiff pre-recorded two shows to be aired mid-day on both

Saturdays and Sundays, and Roger Gettler pre-recorded two shows to be aired on both Saturday and

Sunday late afternoons.  The Sunday morning slot was filled with a syndicated show.

Roger Gettler made a base salary of $44,100 in 2000, and $46,300 in 2001.  Phil Moore made

a base salary of $39,690 in 2000, and $41,675 in 2001.  Plaintiff made a base salary of $24, 333 in

2000, and she would have made $25,000 in 2001, if she had stayed the entire year.

A technical aspect of this case is the system of rating the radio station and individual time slots for different listener demographics.  Businesses use these ratings to make decisions about which stations and time slots they should use for their advertisements.  A company called Arbitron conducts ratings four times a year (Spring, Summer, Fall and Winter), and the resulting ratings are called "books."  There was uncontested testimony that the Spring and Fall Books are the more critical of the four ratings periods.

The Arbitron ratings are not fully explained in the record.  It appears that Arbitron rates individual time slots, as well as the overall station, according to different demographic profiles (for instance, "Persons, [aged] 25-54," or "Women, [aged] 25-54").  The ratings can be quantified as an ordinal ranking--that is, the station is placed first, second, third, etc., in a particular listener demographic--or as a percentage of the market share of that demographic during a particular time slot.

According to his employment contract with Citadel, Gettler was eligible for bonuses for each book based on the rankings of the entire station (all time slots) for the focus groups Persons 25-54 *and* Women 25-54.  There were different bonus scales for the two demographics, and Gettler's entitlement to bonuses was based on the station's ordinal rankings in those two groups.  Between November 2000 and November 2001, Gettler received bonuses totaling $5,500.00.

Moore's employment contract, similarly, allowed for bonuses for each book based on the rating of his show, Monday through Friday, 6:00 a.m. to 10:00 a.m., in the demographics of Persons 25-54 *and* Women 25-54.  Again, there were different bonus scales for the two demographics, and Moore's entitlement to bonuses was based on ordinal rankings.  Between November 2000 and November 2001, Moore received bonuses totaling $3,550.00.

There is no evidence in the record that Plaintiff had an employment contract for compensation and/or bonuses, and Plaintiff stated in her deposition that she never had a contract with Citadel.  On November 7, 2000, Gettler sent Plaintiff a memo informing her that she had earned a $300.00 bonus based on the 2000 Summer Book in the demographic of Persons 25-54, Monday through Friday, for her 10:00 a.m. to 3:00 p.m. time slot.  It is undisputed that this bonus was calculated using Plaintiff's show's market share rating, as opposed to its ordinal ranking.[1]

In approximately March 2001, Defendant decided to change the format of Magic 99.5 from soft rock to something "funner."  Plaintiff was directed to add energy to her live shows, including spending more time on the air talking with telephone callers and discussing current events, such as celebrity awards shows and weddings.  Gettler told Plaintiff on a number of occasions, verbally and in writing, to increase her energy and talk more when she was on the air, in order to fit in with the new format.  Gettler also criticized Plaintiff for not arriving at the station a full half hour before her on-air shift was to begin, in order to conduct the research necessary to have topical information to discuss on the air.

On June 26, 2001, Gettler sent Plaintiff a memo telling her that these areas--that is, on-air energy, talking more and not relying on "liners," and her arrival time--still needed improvement.  On July 7, 2001, Gettler sent another memo, praising Plaintiff for her improvement and identifying areas where she still could be better.  In that memo Gettler wrote, "Keep it up!"

Gettler testified in his deposition that he noticed an immediate drop in Plaintiff's performance in these areas right after he had issued the July 7, 2001 memo.  On July 12, 2001, at the direction of

---

[1]Plaintiff has not argued how a calculation based on market share, as opposed to ordinal ranking, is less advantageous to her.

Citadel's upper management, Gettler placed Plaintiff on probation because of her poor or inconsistent performance under the new format.

On July 16, 2001, after trying to initiate a discussion about the probation with manager Kris Abrams and being directed to take the matter up with Gettler the following day, Plaintiff walked out of the station and later sent a letter of resignation.


## II.    ALLEGATIONS

Plaintiff alleges that, because of her gender, she was treated less favorably than Moore, paid less than Gettler and Moore, and was constructively discharged when she was forced to quit under intolerable workplace conditions.[2]

### A. Disparate Treatment

Plaintiff claims that Defendant engaged in gender discrimination under Title VII and the New Mexico Human Rights Act, N.M. Stat. Ann. §28-1-7(A) (2001) ("NMHRA") based on the following allegations:

1) Gettler required Plaintiff to pre-record two weekend shows per week, but he required Moore to pre-record only one weekend show per week.

2) When Gettler was not at the station, he required Plaintiff to "merge" the music and commercial logs, but he never required Moore to do this task.[3]

3) After approving Plaintiff's request for two vacation days, Gettler required her to pre-record the two shows to air while she was on vacation, but he never required Moore or himself to pre-record shows to air during vacation time.

---

[2]Plaintiff also made a claim for retaliatory discharge, but withdrew that claim in her response.

[3]A "commercial log" is the programming of commercials to be played on the air.  Commercial logs are assembled by the "traffic department" at the radio station.

4) On one occasion, Gettler required Plaintiff to come to work when she was sick and pre-record a show to air during her shift, but he never required Moore to pre-record shows when he was sick.

5) Gettler took away Plaintiff's music programming responsibilities in August 2000.

6) Gettler placed Plaintiff on a two-week probationary period in July 2001, even though her Arbitron ratings were high, but he never put Moore on probation, even though his Arbitron ratings were lower.

7) Citadel management threatened to fire Plaintiff around the same time Gettler put her on probation (mid-July 2001).

**B.     Disparate Compensation**

Plaintiff also alleges that Defendant engaged in gender discrimination under Title VII and the

NMHRA by compensating her less than Gettler and Moore, based on the following:

1) Both Gettler and Moore were paid significantly higher salaries than Plaintiff.

2) Gettler and Moore's bonus incentives were based on different, easier-to-achieve rating measurements than Plaintiff's bonus incentives.

3) Gettler and Moore, in fact, received significantly higher bonuses than Plaintiff during 2000 and 2001, even though Plaintiff's ratings were better.

**C.     Constructive Discharge** [4]

Plaintiff alleges that Defendant's combined actions created a work environment that was so

intolerable that she was forced to quit her job.

---

[4]It is unclear whether Plaintiff brings constructive discharge as a separate claim under Title VII, as occurs in some cases, or whether she alleges that her constructive discharge was the "adverse employment action" prong of a Title VII disparate treatment case, as other plaintiffs have argued. In an unpublished opinion, the Tenth Circuit held that constructive discharge can be a basis for a Title VII claim of discriminatory conduct of its own right, but it should not be analyzed under the rubric of disparate treatment. *Apgar v. Wyoming*, 221 F.3d 1351, *7 (10th Cir. 2000). Rather, the plaintiff must allege facts sufficient to demonstrate under an objective test that a reasonable person would have viewed working conditions as intolerable.

## III.    LEGAL STANDARDS

Summary judgment should be granted to the moving party when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  All evidence will be construed in the light most favorable to the non-moving party, and all reasonable inferences will be drawn in the non-moving party's favor. *Danville v. Regional Lab Corp.*, 292 F.3d 1246, 1249 (10th Cir. 2002).  Dispute over a material fact is "genuine," for purposes of a summary judgment motion, if a rational jury could find in favor of the nonmoving party on the evidence presented.  *Ortiz v. Norton*, 254 F.3d 889, 893 (10th Cir. 2001).

Plaintiff has presented no direct evidence that Defendant was motivated by an intent to discriminate against her based on gender.  Of course, Plaintiff can still resist summary judgment using indirect evidence for disparate treatment and compensation claims under Title VII under the standards developed in *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973), and its progeny.  *E.g., Wells v. Colorado Dept of Transp.*, 325 F.3d 1205, 1212 (10th Cir. 2003).

With respect to the NMHRA, the New Mexico Supreme Court has approved of the use of the *McDonnell Douglas* analysis, although it is not the required method of proof.  *Smith v. FDC*, 109 N.M. 514, 787 P.2d 433 (1990) (holding that *McDonnell Douglas* analysis provides "guidance" in proving discrimination in NMHRA case); *Sonntag v. Shaw*, 130 N.M. 238, 246-47, 22 P.3d 1188, 1196-97 (2001) (same).  Because the parties have presented arguments based on the *McDonnell Douglas* framework, the Court will apply that method in this case.

Under the *McDonnell Douglas* method, a plaintiff successfully resists summary judgment first by establishing a prima facie case of discrimination, the elements of which vary depending on the

nature of the claim. *Randle v. City of Aurora*, 69 F.3d 441, 451 n.13 (10th Cir. 1995). Satisfaction of the prima facie case creates a rebuttable presumption of discrimination. *Kendrick v. Penske Transp. Serv's, Inc.*, 220 F.3d 1220, 1227 (10th Cir. 2000). The burden of establishing the prima facie case is "not onerous." *Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

If the plaintiff establishes her prima facie case, the burden shifts to the defendant to produce legitimate business reasons for its conduct. This is an "exceedingly light" burden. *Sprague v. Thorn*, 129 F.3d 1355, 1363 (10th Cir. 1997) (Equal Pay Act case).

If the defendant sets forth legitimate business reasons for its conduct, the plaintiff may still defeat summary judgment if she can offer some evidence that the defendant's offered reasons were pretextual--that is, unworthy of belief. *Randle*, 69 F.3d at 451. At the summary judgment stage, the plaintiff need not establish that the defendant was actually motivated by discriminatory animus. She must merely show that there are issues of fact that call into question the believability of the reasons offered by the defendant. *Id*. at 451-53 & n.17. If the case proceeds to trial, the plaintiff will bear the ultimate burden of demonstrating that the employer acted with discriminatory intent. *Id*.

For a constructive discharge claim, a plaintiff "must show that the employer by its unlawful acts made working conditions so intolerable that a reasonable person in the employee's position would feel forced to resign." *Sprague*, 129 F.3d at 1367. This is an objective standard. A plaintiff must show that the working conditions were so unbearable that a reasonable person would have had "no choice but to quit." *Garrett v. Hewlett Packard*, 305 F.3d 1210 (10th Cir. 2002).

## IV.   DISCUSSION

Plaintiff's claims for disparate treatment on the basis of gender stem from the following allegations:   Defendant placed her on probation in July 2001; Defendant rescinded her music scheduling responsibilities in August 2000; and Defendant treated her less favorably than her male counterpart, Mr. Moore, in requiring her to do tasks, such as pre-recording extra radio shows and occasionally merging the commercial and music logs, which Moore did not have to do.

Plaintiff also claims that the Defendant compensated her less than Moore and Gettler because of her gender, based on the following allegations: Moore and Gettler had significantly higher base salaries; and Moore and Gettler had a bonus structure that enabled them to obtain significantly higher bonuses than Plaintiff, even though she had higher Arbitron ratings than either Gettler or Moore.

In its defense, Citadel argues that neither Gettler nor Moore was similarly situated, that Plaintiff did not suffer from an adverse employment action, and, in any event, Plaintiff cannot raise an inference that Defendant may have acted with discriminatory intent.

### A. Disparate Treatment

#### 1. Prima Facie Case

In its motion for summary judgment, Defendant argues as if the only way for a plaintiff to achieve her prima facie case is through the four-pronged analysis set out in *Cole v. Ruidoso Municipal Schools*.  43 F.3d 1373, 1380 (10th Cir. 1994) (setting out the following four-pronged analysis in a failure to renew employment contract case: (1) plaintiff belonged to a protected class; (2) plaintiff was adversely affected by the employer's action; (3) plaintiff was qualified for the position; and (4) plaintiff was treated less favorably than her male counterparts).  However, the Supreme Court has clearly stated that a plaintiff may demonstrate his or her prima facie case in a

variety of ways, depending on the facts of the case. *McDonnell Douglas*, 411 U.S. at 802.  There must be "at least a logical connection between each element of the prima facie case and the illegal discrimination for which it establishes a legally mandatory, rebuttable presumption." *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 311-12 (1996).  Ultimately, the prima facie inquiry is "whether the plaintiff has demonstrated that the [employer's conduct] occurred under circumstances which give rise to an inference of unlawful discrimination." *Kendrick*, 220 F.3d at 1227.

With respect to this case, there is no dispute that Plaintiff belongs to a protected class (women) and that she was qualified to hold her position as a radio announcer.  While there is some dispute about whether the conduct of which Plaintiff complains qualifies as an "adverse employment action," there is no material dispute that the conduct occurred.

There is considerable variability in the types of factual situations to which the concept of "disparate treatment" applies, but in many, the plaintiff compares herself to other employees who are "similarly situated."  In some cases, the plaintiff complains that the employer took an adverse action against her for doing something "wrong," but did not take comparable adverse action against a similarly situated employee who engaged in the same or similar conduct, and the reason the employer did so was based on impermissible discrimination.  In that type of case, similarly situated employees are "those who deal with the same supervisor and are subject to the same standards governing performance, evaluation, and discipline." *Aramburu v. The Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997).[5]

---

[5]In determining whether employees are similarly situated, the Court further instructed district courts to "compare the relevant employment circumstances, such as work history and company policies, applicable to employee and intended comparable employees in determining whether they are

In *Aramburu*, the plaintiff alleged that he, a Mexican-American employee, was terminated for absenteeism but similarly situated employees were not discharged for violating rules of comparable seriousness.  112 F.3d at 1403.  *But see Kendrick*, 220 F.3d at 1229 (holding that, in a discharge case, a plaintiff need not compare himself to another employee as long has his job was not eliminated after he was terminated).

In other cases, plaintiffs have claimed disparate treatment because they were subjected to an employment action that is not as clearly defined as "adverse" as a termination or disciplinary action. In these cases, the plaintiff alleges that the employer failed to hire or promote her because of her membership in a protected group. *E.g.*, *Sprague*, 129 F.3d at 1361-62 (failure to promote); *Randle*, 69 F.3d at 453-54 (10th Cir. 1995) (same); *cf. Danville v. Regional Lab Corp.*, 292 F.3d 1246 (10th Cir. 2001) (ADEA failure to hire case).

In a third type of disparate treatment case, the plaintiff complains of generally less favorable treatment than other employees who occupy essentially the same position as the plaintiff, because she is a member of a protected group. *E.g.*, *Greer v. St. Louis Regional Med. Ctr.*, 258 F.3d 843, 846 (8th Cir. 2001) (holding that a female plaintiff had established a prima facie case and demonstrated issues of material fact regarding pretext to resist summary judgment, where plaintiff was on-call for more hours and was compensated less than three similarly situated employees).

This Court has evaluated summary judgment in a similar case, *Stieber v. Journal Publishing Company*.  CIV No. 93-0648 LH/LFG, *aff'd*, 99 F.3d 1150 (10th Cir. 1996).  In *Stieber*, a female newspaper reporter claimed that she was treated differently than employees whom she alleged were similarly situated, based on her gender. *Id*.  This Court granted summary judgment to the employer

similarly situated." *Id*.

-11-

on the disparate treatment claim because the plaintiff was not treated any differently than an employee who occupied a similar position, and the employees to whom Plaintiff did compare herself were not similarly situated.

Taking Plaintiff's separate allegations of disparate treatment as a whole, this Court will apply the following prima facie prongs to evaluate her case: (1) does Plaintiff belongs to a protected class; (2) was Plaintiff qualified to hold the job in question; and (3) was Plaintiff treated less favorably than similarly situated employees. *See generally, Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1315 (10th Cir. 1999)("Disparate treatment claims involve the most easily understood type of discrimination in which an employer treats an individual less favorably than others because of her protected status.") (internal punctuation and citations omitted).

There is no question that Plaintiff was, in some respects, treated less favorably than fellow employee, Mr. Moore.  Plaintiff had to pre-record one radio show per week more than Mr. Moore, which required her to expend twenty to forty-five minutes per week in pre-recording time more than Mr. Moore.[6]  Plaintiff once had to pre-record shows to air when she went on vacation, and Moore never had to pre-record his shows when he took vacation days.  Plaintiff once had to come to the studio when sick to pre-record a show to air while she was absent, and Moore never had to pre-record a show when he was sick.  Additionally, Plaintiff was required to merge the commercial and music logs for Mr. Gettler when Mr. Gettler was not in the office, which required her to stay at work for an additional few minutes after her on-air shift was over.  Mr. Moore was not required to do this.  Gettler took away Plaintiff's music programming responsibilities in August 2000. Finally,

---

[6]The Court notes that Plaintiff does not allege, nor does the record reflect, that Plaintiff actually worked more hours per week than Moore, overall.

Plaintiff was placed on probation in July 2001, and there is nothing in the record to suggest that Mr. Moore was also placed on probation.

Defendant initially argues that Plaintiff did not suffer an "adverse employment action," precluding a claim under Title VII and the NMHRA.  Section 2000e-2(a) of Title VII states:

> It shall be an unlawful employment practice for an employer (1) to fail or refuse to hire or to discharge any individual or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

Title VII encompasses the kinds of disparate treatment of which plaintiff complains, even if much of Defendant's conduct does not fit neatly into the "adverse employment actions" addressed in other cases.  In any event, being placed on probation is an adverse employment action, at least in claims for discriminatory retaliation, *Selenke v. Medical Imaging of Colorado*, 248 F.3d 1249 (10th Cir. 2001),  and the Court will regard probation as an adverse employment action in this case as well.

Defendant also argues that Mr. Moore was not similarly situated to Plaintiff because his radio show was the morning drive time show, which required more interaction with listeners, as well as the presentation of news and traffic feeds.  Defendant also asserts that Plaintiff and Moore could not be considered to be similarly situated because Moore has over twenty years of radio experience, whereas Plaintiff only had about five years.

The Court is wary of using these types of distinctions to compare the two employees at the prima facie stage of the analysis.[7]  *See generally, Ortiz v. Norton*, 254 F.3d 889 (Tenth Cir. 2001)

---

[7]In perusing the deposition transcripts and attachments, the Court notes that Moore had an employment contract, whereas Plaintiff likely did not.  There is some question about whether the two

(holding that the district judge committed reversible error when he used the defendant's proffered reasons for taking the adverse employment action to determine whether other employees were similarly situated with plaintiff, because it precluded plaintiff from being able to establish that the reasons offered by the defendant were pretextual). Taking the facts in the light most favorable to the non-moving party, both Plaintiff and Moore were radio announcers at Magic 99.5, presenting live shows on weekdays and pre-recording shows for the weekends. They were both salaried employees under the supervision of Roger Gettler. Plaintiff's burden in showing that another employee is similarly situated is not supposed to be onerous, and the Court finds that she has established that she and Moore were similarly situated. Therefore, Plaintiff has met her prima facie burden.

### 2. Defendant's Business Reasons

In response, Defendant offers business reasons for each of the instances of disparate treatment alleged by Plaintiff. For instance, Gettler required Plaintiff to pre-record two weekend shows when Moore only had to record one because: (1) Moore's weekday shifts were more demanding; (2) the station aired a syndicated show on Sunday mornings and so did not need a show pre-recorded for that slot; and (3) the station, through Gettler, had decided that it did not want to risk over-exposing the market with Moore's radio personality by having his shows air seven days a week.

Regarding Gettler's requirement that Plaintiff pre-record two shows to air while she was on vacation, Defendant asserts that the particular vacation days of which Plaintiff complains fell within the 2001 Spring Book ratings period, and the station needed her to pre-record her shows to maintain consistency for the ratings. Moore was never required to pre-record his shows when he went on

---

employees can be compared because of differences in their statuses as contract or non-contract employees. However, the parties did not explore the employment contract issue sufficiently in their briefs or at oral argument for the Court to rule based on that difference.

vacation because his weekday shows had to be live, and Moore never took vacation time during a ratings period.  Similarly, Defendant states that Gettler only required Plaintiff to come in once to pre-record a show when she was ill, and he did so only because the station was understaffed.  Moore was never required to pre-record shows when he was sick because he never called in sick.

Regarding Gettler's requirement that Plaintiff, and not Moore, merge the music and commercial logs when he was out of the office, Gettler states that he did so because the "traffic department" did not complete the commercial logs until 2:00 or 3:00 p.m.  By that time, Moore's shift was over, and he had gone home.  Plaintiff, on the other hand, was scheduled to be on the air until 3:00 p.m. and would be in the office to do the task.  The merging task apparently took only a few minutes.

With respect to taking Plaintiff's music programming responsibilities in August 2000, Gettler stated that he absorbed those duties because it was easier for him to do it in the morning, and he could do the task very quickly.

Finally, with respect to placing Plaintiff on probation, Defendant urges that it did so for legitimate reasons.  Despite having been instructed to liven up her show, provide more interaction with listeners, and discuss current events to conform to the station's new format, as well as to arrive earlier at the station for her shift, Plaintiff did not correct her conduct to Defendant's satisfaction.  She was warned, verbally and in writing, of what Defendant expected of her.  Plaintiff even improved on an air check shortly after receiving criticism from Gettler.  According to Gettler, however, as soon as he recognized Plaintiff's improvement in a memo, she slipped back into her old patterns.  While it is true that Moore was not placed on probation, Plaintiff has never alleged that Moore's performance suffered from like deficiencies that would warrant a comparable probationary period.

In examining the business reasons Defendant has offered to explain treating Plaintiff differently than Mr. Moore, the Court finds that Defendant has met its burden of production.

### 3. Pretext

The types of evidence that would create a genuine issue of fact about Defendant's proffered reasons can be (1) evidence that the defendant's stated reason for the discrepancy was false; (2) evidence that the defendant acted contrary to a written company policy prescribing the action taken by the defendant; or (3) evidence that the defendant acted contrary to an unwritten policy or contrary to company practice.  *Kendrick*, 220 F.3d at 1230.  In evaluating the sufficiency of the evidence offered by the plaintiff to show pretext, the Court cannot second-guess the business decisions of the defendant.  *Id*. at 1233.

To show that Defendant's reasons for treating her differently than Moore are unworthy of belief, Plaintiff relies primarily on the fact that her Arbitron ratings were better than Moore's and Gettler's.  Plaintiff asserts that Defendant's reason for placing her on probation--what she calls "inadequate performance"--could be called into question when examined alongside her outstanding Arbitron ratings.

The Court is at an utter loss to understand how Plaintiff's superior Arbitron ratings serve to show that Defendant's reasons for treating her differently than a similarly situated employee might not be worthy of belief.  Plaintiff does not dispute that the specific factors for which Defendant placed Plaintiff on probation--her "flat" on-air personality, her tardiness, and her attitude--were true, or that Citadel had a written or unwritten policy not to discipline announcers who otherwise were bringing in good ratings.  The reasons Defendant offered have nothing to do with Plaintiff's Arbitron ratings.

No reasonable jury could find, based on the superiority of Plaintiff's ratings, that Defendant's reasons might be pretextual.

Plaintiff also argues that a memorandum dated July 7, 2001, in which Gettler praised her for improving only days before putting her on probation, and the following deposition testimony of Roger Gettler, raise questions about Defendant's proffered reasons:

> Q. Do you remember in July 2001 that Citadel placed Jennifer on probation for two weeks?
>
> A. Yes, I do.
>
> Q. What was that about?
>
> A. I believe this was the beginning of our period of transition towards funning up the radio station.  And this was where we were having some trouble getting the execution of what we were looking for.
>
> Q. Looking back on it, do you think this probationary period was justified?
>
> A. You know, it's hard to say.  We were given directives.  And whether those directives were necessary for the station to improve or not, we do what we're told.  And if Jenna was not able to execute the directives, then the probation was necessary.
>
> Q. So, it wasn't for you to determine whether or not it was justified?  That's what you're saying?
>
> A. Yeah.  I followed my job orders.
>
> Q. Looking back on it, though, do you believe that perhaps those who were telling you what to do were unjustified in their approach?
>
> A. Completely.

(Gettler depo. pp. 20-21).

The July 7, 2001 memorandum and Gettler's testimony do nothing to show that Defendant's reasons for placing Plaintiff on probation on July 12, 2001 were false or contrary to written or

unwritten company policies or practices.  Gettler opines that upper management may have been "unjustified in their approach," but there is nothing in his testimony from which a jury could infer that the stated reasons were unworthy of belief. This evidence simply is insufficient for any jury to infer pretext.

With respect to the other instances of differential treatment--pre-recording extra shows and merging the music and commercial logs--Plaintiff puts forth no evidence whatsoever to suggest why Defendant's reasons for treating her differently might be unworthy of belief.  Therefore, Plaintiff has failed to overcome summary judgment because she cannot establish the possibility that a jury could find that Defendant was acting for reasons other than those offered.  Summary judgment on Plaintiff's claim of disparate treatment will be granted.

### B. Disparate Compensation

#### 1. Prima Facie Case

For a claim of disparate compensation, "a female Title VII plaintiff establishes a prima facie case of sex discrimination by showing that she occupies a job similar to that of higher paid males." *Sprague*, 129 F.3d at 1363 (internal punctuation and citations omitted).  As an initial matter, a plaintiff must show that her job and those to which she compares it are similar, but the two jobs do not have to be identical.  *Id.* at 1362.  However, when a plaintiff compares her compensation to someone, like a supervisor, who has significant duties *in addition to* those she claims are similar, the two jobs are not similar.

In this case, Plaintiff compares herself not only to Moore, but also to Gettler, her direct supervisor.  Gettler's job was not sufficiently similar to Plaintiff's job because not only was he a radio announcer, he was also the station's program director.  For the reasons stated above, however, the

Court rules that Moore's job was sufficiently similar for Plaintiff to meet her prima facie case and compare her compensation to his.

It is not disputed that Defendant paid Moore a higher base salary than Plaintiff or that Moore took a higher dollar amount in bonuses in 2000 and 2001. There is also no dispute that the structure by which Moore was entitled to bonuses, based on his Arbitron ratings, was different than the basis for Plaintiff's one-time bonus. Plaintiff has established her prima facie case with respect to disparate compensation.

### 2. Defendant's Business Reasons

In response, Defendant offers the following reasons for compensating Moore with a higher base salary and bonus structure: (1) it is customary in the radio industry to pay the morning announcer higher salaries and greater bonus incentives than the afternoon announcer because the morning drive shift is critical for attracting listeners for the day; (2) morning announcers must work harder than afternoon announcers because they must coordinate news and traffic reports with the live program; (3) Moore, in particular, had over twenty years' experience, whereas Plaintiff only had five years' experience; and (4) Plaintiff possessed less bargaining power in establishing her bonus structure because she was a midday announcer. Defendant has met its burden of production of non-discriminatory reasons for compensating Plaintiff less than Moore.

### 3. Pretext

Again, Plaintiff relies primarily on the success story of her Arbitron ratings to attempt to demonstrate that Defendant's reasons for compensating her less than Moore might not be worthy of belief. She presents evidence, through the deposition testimony of former Citadel manager, Dewey Moede, that her ratings were objectively better than Moore's during 2000 and 2001. Defendant has

challenged Mr. Moede's testimony as inadmissible under Federal Rules of Evidence 602 and 702, arguing that Mr. Moede did not have personal knowledge about the facts of this case to serve as a lay witness.  Defendant also opposes the use of Mr. Moede as an expert because there is no basis contained in his deposition testimony to establish that he has the knowledge and skill to read and understand Arbitron ratings.

The Court agrees with Defendant that Mr. Moede did not have personal knowledge about Plaintiff's case.  He has testified that he did not work at Citadel in July 2001, when many of the events in this case took place, and he was never involved in determining the salaries or bonus structures of either Moore or Plaintiff.  Therefore, the Court will disregard the testimony of Mr. Moede to the extent he comments on the events surrounding this case.

The Court does believe for purposes of summary judgment only, that Plaintiff established that Mr. Moede was qualified to read the Arbitron print-outs, as he did in his deposition.  Mr. Moede's statements as to the content of the Arbitron print-outs will be accepted, but, to the extent he uses the print-outs to interpret the value of Plaintiff as an employee and to comment on the conduct of Defendant, Mr. Moede's statements will not be considered.

In addition to her allegedly outstanding Arbitron ratings, Plaintiff points to Moore's employment contract, which establishes two ratings demographics by which he could be entitled to bonus compensation (the ordinal ranking of Women 25-54 and Persons 25-54).  In contrast, Plaintiff's one bonus award from the 2000 Summer Book was, in fact, based on her show's market share of the demographic Persons 25-54 only.  This difference, she argues, creates a dispute of fact that raises a question about Defendant's reasons for compensating her less, overall.

Plaintiff does not argue that any of Defendant's proffered reasons are false or contrary to company policy, except to say that Magic 99.5 did not fit the typical pattern of having the highest ratings on the morning shift.[8]  Plaintiff seems to imply that Defendant's failure to award the allegedly highest performing employee with equal or better compensation is evidence, in and of itself, that Defendant's reasons must be unworthy of belief.  Again, the superiority of Plaintiff's ratings do nothing to create a factual dispute about any of the reasons Defendant offers for the differential in compensation between Plaintiff and Moore.  No reasonable jury could question the credence of Defendant's reasons based on the evidence Plaintiff presents.  Plaintiff has failed in her endeavor.  Summary judgment will be granted on Plaintiff's claims of disparate compensation.

## C. Constructive Discharge

Other than her own declaration, Plaintiff has not submitted a scintilla of evidence to suggest that the conditions at Magic 99.5 were objectively intolerable.  In her declaration, Plaintiff states that, when Defendant placed her on probation, she "could no longer endure working at Magic 99.5," and that her "e-mails [expressing that she enjoyed and had fun working for Defendant] mask[ed] the misery [she] suffered by being discriminated against."  (Furaus Decl.).  This statement is insufficient to show the working conditions were *subjectively* intolerable, much less objectively intolerable.

Federal Rule of Civil Procedure 56(e) requires that a party adverse to a motion for summary judgment must, by affidavit or otherwise, "set forth *specific* facts showing there is a genuine issue for trial."  (emphasis added).  Plaintiff's declaration does not set forth any specific facts showing that

---

[8]The Court notes that no evidence was presented about Magic 99.5's target demographic of listeners for each time slot or what revenues Plaintiff's and Moore's' time slots actually netted in 2000 and 2001.  Perhaps the net sales associated with a number one rating in the midday slot still does not exceed the net sales of a number three rating in the morning slot.

there is a genuine issue of fact regarding the gravity of the work conditions at Magic 99.5.  In any event, the Court is convinced that no reasonable jury could find that the working conditions were objectively so unbearable that an employee would have "no choice but to quit."  Therefore, summary judgment will be granted to Defendant on constructive discharge.


**IT IS, THEREFORE, ORDERED** that summary judgment is granted with respect to each of Plaintiff's claims.  Pursuant to Federal Rule of Civil Procedure 58(a)(1), a separate judgment will be entered concurrently with this Memorandum Opinion and Order.

_____
**UNITED STATES DISTRICT JUDGE**